UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

   - against -

PATRICIA SHIELDS,
              Defendant.

------------------------------------X

07 Cr. 320-02 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

On March 21, 2008, Patricia Shields ("Shields" or "Defendant") appeared before the Honorable Michael H. Dolinger and pleaded guilty to one count of Conspiracy to Fraudulently Obtain Federal Funds and to Commit Mail Fraud, in violation of 18 U.S.C. § 371, one count of Theft of Government Funds, in violation of 18 U.S.C. §§ 641 and 642, and one count of Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1342. For the reasons set forth below, Shields will be sentenced to 12 months and a day imprisonment and 3 years supervised release. Shields also will be required to make restitution of $49,439.08, and pay a special assessment of $300.

**Prior Proceedings**

On April 17, 2007, Indictment 07 Cr. 320 was filed in the Southern District of New York. Count 1 charges that from September 2001, up to and including October 2003, in the Southern District of New York and elsewhere, Scott Shields, Patricia Shields, and others known and unknown, conspired together to steal and receive money in excess of $1,000 from the Department of Homeland Security's ("DHS") Federal Emergency Management Agency ("FEMA") and from the American Red Cross, in violation of 18 U.S.C. §§ 641 and 1341. Count 2 charges that from September 2001 up to and including October 2003, in the Southern District of New York and elsewhere, Scott Shields and Patricia Shields unlawfully, through fraud and deceit, received approximately $38,906.00 in FEMA Mortgage and Rental Assistance to which they were not entitled. Count 3 charges that in July 2002 and August 2002, in the Southern District of New York and elsewhere, Scott Shields and Patricia Shields unlawfully, through fraud and deceit, caused the American Red Cross to have the United States Postal Service deliver a check in the amount of $10,533.08 to Scott Shields at 225 Rector Street, Apartment 23G, New York, NY.

On March 21, 2008, Defendant pleaded guilty to her criminal conduct as charged.

On November 27, 2008, the Government presented its position on the application of the U.S. Sentencing Guidelines in a <u>Pimintel</u> letter, as follows:

- The Guidelines in effect as of November 1, 2007, apply in this case.

- Pursuant to §3D1.2, Counts One, Two and Three are grouped. Counts One Two and Three have an applicable guidelines offense level of 11, calculated as follows:

- Pursuant to §2B1.1(a)(1), the base offense level is 7. Pursuant to §2B1.1(b)(1)(D), a 6-level increase is appropriate because the loss exceeded $30,000.

- The defendant has accepted responsibility and as such, a two-level reduction will be warranted, pursuant to § 3E1.1(a).

- Based on the information now available to the U.S. Attorney's Office, Defendant has two criminal history points, and is accordingly in Criminal History Category II.

- Based on the calculations set forth above, Defendant's Sentencing Guidelines range for Counts One, Two and Three of the Indictment is 10-16 months' imprisonment. In addition, after determining Defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines offense level 11, the applicable Guidelines fine range is $2,000 to $20,000.

Sentencing is scheduled for October 14, 2008.

**<u>The Sentencing Framework</u>**

In accordance with the Supreme Court's decision in <u>United</u>

3

States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") established by the United States Sentencing Commission. As the Supreme Court explained in Gall v. United States, 128 S.Ct. 586 (2007):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented.

Id. at 596 (internal citation and footnote omitted). Thus, in addition to analysis of the Guidelines, the sentence imposed here results from consideration of:

   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2) the need for the sentence imposed-

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B) to afford adequate deterrence to criminal conduct;

4

> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for-
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
>
> (5) any pertinent policy statement . . . [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 111.

In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 128 S. Ct 558, 571 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth

5

in § 3553(a), it is determined that a Guidelines sentence is warranted in the instant case.

**The Defendant**

The Court adopts the facts set forth in the Probation Department's Presentence Investigation Report ("PSR") with respect to Defendant's personal and family history.

**The Offense Conduct**

The following description draws on the PSR. The specific facts of the underlying conduct are adopted as set forth in that report.

Following the events of September 11, 2001, Scott Shields and Patricia Shields, who are brother and sister, applied for Mortgage and Rental Assistance from FEMA by providing information in-person in Manhattan, via telephone and in writing. The FEMA Mortgage and Rental Assistance program has certain eligibility criteria that applicants had to satisfy in order to qualify for benefits in the wake of the September 11 tragedy. Generally, applicants had to either have resided in the vicinity of the World Trade Center on September 11, 2001, been injured as

a result of the September 11 attack, or had their business activity significantly affected by the events of September 11, either because that business was located in lower Manhattan or depended upon business/customers that were residents in lower Manhattan.

When they applied for FEMA Mortgage and Rental Assistance shortly after September 11, 2001, Scott and Patricia Shields were not eligible for assistance under the program because they were residing and working in Greenwich, Connecticut at the time. Despite the fact that they were not eligible for the FEMA assistance, they represented in application materials that they lived or worked around the World Trade Center site at the time of the disaster. Records obtained by the Government in the course of the investigation reflect (and witnesses have confirmed) that Scott and Patricia Shields were renting a home in Greenwich as of September 11, 2001, and were subsequently evicted from that home the following month, in October 2001, for non-payment of rent.

As a result of their application for FEMA Mortgage and Rental Assistance, Scott and Patricia Shields received a total of $38,906, in a series of payments that were based on successive renewal applications. Each of these applications contained

misstatements regarding (1) where the defendants resided at the time of the 9/11 attacks, and (2) how they had used the previously paid assistance.

Specifically, the Shields misrepresented that they were living in an apartment in lower Manhattan at the time of the September 11 attacks. While they did relocate to an apartment in lower Manhattan after they were evicted from their rental property in Greenwich, they were not residing in that apartment at the time of the World Trade Center attack. In addition, although they represented that they had used monies received from the FEMA Mortgage and Rental Assistance program in order to pay rent owed on their lower Manhattan apartment, records reflect that the Shields did not use any of the FEMA monies for this purpose, and were entirely delinquent in making rent payments on their lower Manhattan apartment from the time they moved in until they were subsequently evicted for non-payment of rent.

In addition, following the events of September 11, 2001, Scott and Patricia Shields also applied for assistance from the American Red Cross. Based on the misrepresentation that at the time of the attacks they resided below Canal Street in Manhattan (which misrepresentation was made by the Shields in-person to a Red Cross volunteer in Manhattan), the Red Cross paid

the defendants a total of $10,533.08. This payment was made by check, which was mailed from the Red Cross in Virginia to the Shields' lower Manhattan address, to which they moved following the events of September 11.

On March 20, 2007, Scott and Patricia Shields were arrested. They are being held accountable for a combined total of $49,439.08 received from FEMA and the American Red Cross.

**The Relevant Statutory Provisions**

The maximum statutory sentence for violation of 18 U.S.C. § 371 is five years imprisonment. Count I therefore constitutes a Class D felony, pursuant to 18 U.S.C. § 3559(a)(4). There is no applicable statutory minimum sentence.

The maximum statutory sentence for violation of 18 U.S.C. § 641 is ten years imprisonment. Count II therefore constitutes a Class C felony, pursuant to 18 U.S.C. § 3559(a)(3). There is no applicable statutory minimum sentence.

The maximum statutory sentence for violation of 18 U.S.C. § 1341 is twenty years imprisonment. Count III therefore constitutes a Class C felony, pursuant to 18 U.S.C. § 3559(a)(3).

There is no applicable statutory minimum sentence.

The Court may also impose a term of supervised release of up to three years, pursuant to 18 U.S.C. § 3583(b)(2).

The maximum fine for each Count is the greater of $250,000 or twice the gross loss or gain resulting from the offense, pursuant to 18 U.S.C. § 3571. A special assessment of $300 is mandatory, pursuant to 18 U.S.C. § 3013.

Defendant is eligible for not less than one and no more than five years' probation, pursuant to 18 U.S.C. § 3561(c)(1). Because the offense is a felony, one of the conditions outlined in 18 U.S.C. § 3563(b) must be imposed as a condition of probation, pursuant to 18 U.S.C. § 3563(a)(2).

**The Guidelines**

The May 1, 2008 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a).

Counts I, II and III are grouped pursuant to §3D1.2(d) because the offense level is determined largely on the basis of

the total amount of harm or loss.

The guideline for a violation of 18 U.S.C. § 641 is found in §2B1.1 provides for a base offense level of 7 pursuant to §2B1.1(a)(1).

Because the loss exceeded $30,000 but was less than $70,000, pursuant to §2B1.1(b)(1)(D) the offense level is increased by six.

Based on Defendant's plea allocution, Defendant has shown a recognition of responsibility for the offense. Pursuant to §3E1.1(a), the offense level is reduced by two.

Accordingly, the applicable offense level is 11.

According to a Greenwich Police Department arrest report, Defendant submitted fraudulent personal checks addressed to Chase Manhattan Bank in excess of $10,000, for which she was arrested on February 14, 1997. She was convicted of Issuant a Bad Check, Grand Larceny 1st Degree, and on January 15, 1999, was sentenced to five years probation. Under §4A1.1(c), this conviction warrants one criminal history point.

According to another Greenwich Police Department arrest report, on November 1, 2001, Defendant issued three worthless checks totaling $15,600, with the knowledge that there was no money in her checking account. After several weeks and official notification, Defendant failed to make payment. An arrest warrant was issued by Stamford Superior Court on January 2, 2001. On January 13, 2001, Defendant was arrested and charged with three felony counts of issuing bad checks. Defendant was convicted, and on June 7, 2001 was sentenced to a $300 fine for each count. Under §4A1.1(c), this conviction warrants one criminal history point.

According to Stamford Connecticut Probation Officer Marvin Parson, Defendant violated probation by failing to make restitution payments and a bench warrant was issued for her arrest in 2003.

At the time the instant offense was committed, Defendant was on probation. Pursuant to §4A1.1(d), two points are added.

According to the sentencing table at Chapter 5, Part A, four criminal history points establish a Criminal History Category of III.

Based on a total offense level of 11 and a Criminal History Category of III, the Guidelines range for imprisonment is 12 to 18 months.

The Guidelines range for a term of supervised release is at least two, but not more than three years, pursuant to §5D1.2(a)(2).

Because the applicable guideline range is in Zone D of the Sentencing Table, Defendant is not eligible for probation, pursuant to §5B1.1, application note 2.

The fine range for the instant offense is from $2,000 to $20,000 or twice the gross gain or loss resulting from the offense, pursuant to §5E1.2(c)(3)(A) and (c)(4). Subject to the Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release imposed, pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,076.83 to be used for imprisonment, a monthly cost of $301.80 for supervision, and a monthly cost of $1,905.92 for community confinement.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) in order to impose a sentence "sufficient, but not greater than necessary," as is required in accordance with the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. Pursuant to all of the factors, it is hereby determined that a sentence within the Guidelines framework is warranted.

## The Sentence

For the instant offenses, Patricia Shields will be sentenced to 12 months and one day imprisonment and a three-year term of supervised release.

Ms. Shields has pled guilty to defrauding the American Red Cross and FEMA, in an attempt to exploit programs that were providing financial assistance to people affected by one of this country's greatest tragedies. This is not Defendant's first interaction with the criminal court system, as she has two prior

14

convictions for issuing bad checks.

Although both Defendant and her brother have expressed concern for the care of their elderly mother and the survival of Defendant's business should they serve a period of incarceration, these situations are not extraordinary, and in light of the gravity of Defendant's crimes and her past criminal history, do not justify a non-Guidelines sentence. In view of these considerations, however, Defendant is being sentenced at the bottom of the Guidelines range.

Defendant is directed to report to the nearest United States Probation Office within seventy-two hours of release from custody to commence a three-year term of supervised release. It is recommended that Defendant be supervised by the district of her residence.

As mandatory conditions of her supervised release, Defendant shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) refrain from any unlawful use of a controlled substance, and shall submit to one drug testing within fifteen days of placement on probation or supervised release and at least two unscheduled drug tests

thereafter, as directed by the probation officer; and (5) cooperate in the collection of DNA as directed by the probation officer.

The standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional three special conditions:

(1) Defendant shall participate in a mental health program approved by the U.S. Probation Office. Defendant shall continue to take any prescribed medications unless otherwise instructed by the health care provider. Defendant shall contribute to the costs of services rendered not covered by third-party payment, if Defendant has the ability to pay. The Court authorizes the release of available psychological and psychiatric evaluations and reports to the health care provider.

(2) Defendant shall provide the probation officer with access to any requested financial information

(3) Defendant shall not incur new credit charges or open additional lines of credit without the

approval of the probation officer unless Defendant is in compliance with the installment payment schedule.

The fine in this case is waived. However, it is ordered that Defendant shall make restitution, payable to the Clerk, U.S. District Court, 500 Pearl Street, New York, N.Y., for disbursement to the following persons in the following amounts:

$10,533.08 is owed to:

> Frank R. Favilla
> Investigator
> American Red Cross 9/11 Program
> 195 Willis Avenue, Suite #212
> Mineola, NY 11501

$38,906 is owed to:

> Janie Cullers
> Financial Management Specialist
> FEMA Lockbox
> P.O. Box 70941
> Charlotte, NC 28272-0941

The factors in 18 U.S.C. § 3664(f)(2) were considered in formulating the payment schedule. If Defendant is engaged in a BOP non-UNICOR work program, Defendant shall pay $25 per quarter toward the criminal financial penalties. However, if Defendant participates in the BOP's UNICOR program as a grade 1 through 4, Defendant shall pay 50% of her monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. § 545.11. Any payment made that is not payment in full

17

shall be divided proportionally among the persons named. No further payment shall be required after the sum of the amounts actually paid by all co-conspirators has fully covered the compensable injury.

Restitution shall be paid in monthly installments of 15% of gross monthly income over a period of supervision to commence 30 days after the date of release from custody.

Defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

A special assessment of $300, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for October 14, 2008.

It is so ordered.

**New York, NY**
**October 9 , 2008**

ROBERT W. SWEET
U.S.D.J.